UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| OVERJET, INC., | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 24-cv-10446-ADB |
| | * | |
| VIDEAHEALTH, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Overjet, Inc. ("Overjet") seeks a preliminary injunction, enjoining VideaHealth, Inc. ("Videa") from infringing its Intellectual Property ("IP") and unfairly competing against it. [ECF No. 8]. Plaintiff contends that Videa improperly uses Overjet's copyrighted color and shape designs for annotating dental X-rays and makes false statements concerning its product's capabilities.[1] [Id.]. Because Overjet has failed to make a sufficient showing that it is likely to

---

[1] In addition to copyright infringement and false advertising claims, Overjet claims trademark infringement in its motion for preliminary injunction. [ECF No. 9 at 6–15]. As Videa has since cured the alleged infringement, Overjet, for the purposes of the present motion, agreed to withdraw any allegations related to Videa's purported use of its trademark. See [ECF No. 38 ("Mot. Hr'g Tr.") at 4:4–5:24]. Accordingly, the Court need not and will not consider Overjet's trademark claims in the instant preliminary injunction ruling.

succeed on the merits or will suffer irreparable harm, Overjet's motion for a preliminary injunction is <u>DENIED</u>.

## I.    BACKGROUND

### A.    Factual Background

Overjet is a dental artificial intelligence ("AI") company formed in 2018 and headquartered in Boston, Massachusetts.  [ECF No. 1 ("Complaint" or "Compl.") ¶¶ 8–10]. Overjet uses AI to scan dental radiographic X-rays and detect dental diseases.  [<u>Id.</u> ¶ 9]. Specifically, Overjet uses an approach called segmentation, which outlines exact borders and shows the extent to which pathologies, or diseases, exist.  [ECF No. 10 ("Inam Declaration" or "Inam Decl.") ¶¶ 6, 7].  In order to enable its segmentation capabilities, Overjet's software annotates diseases and structures on dental X-rays.  [<u>Id.</u> ¶ 8].  The annotation allows clinicians to better detect diseases and devise treatment plans.  [Compl. ¶ 33]; <u>see also</u> [ECF Nos. 11-4, 11-5, 11-6].  Overjet's software segmentation capability has been cleared by the United States Food and Drug Administration ("FDA")[2] and, presently, Overjet is the only dental AI company with

---

[2] <u>On May 19, 2021</u>: the FDA cleared the "Overjet Dental Assist" product, which "is a radiological semi-automated image processing software intended to aid dental professionals in the measurements of mesial and distal bone levels associated with each tooth from bitewing and periapical radiographs." [Compl. ¶ 15].

<u>On May 10, 2022</u>: the FDA cleared "Overjet Caries Assist" ("Caries Assist") for segmentation of caries on bitewing radiographs.  [Compl. ¶ 16].

<u>On March 27, 2023</u>: the FDA cleared a new iteration of Caries Assist, which "expanded the age range and image type and improved model accuracy for caries," approving the software for use on patients twelve years of age and older.  [Compl. ¶ 17].

<u>On December 16, 2022</u>: the FDA cleared "Overjet Calculus Assist," "a radiological automated concurrent-read computer assisted detection software" used to detect interproximal calculus

clearance for "performing dental detection and segmentation to outline exactly where pathologies exist." [Compl. ¶ 10]. Overjet's software is used by dental practices, dental services organizations ("DSOs"), and insurance companies. [Id. ¶ 6].

Overjet has developed several iterations of its software. [Compl. ¶ 14]. Adopting the naming convention "Overjet [X] Assist," it has named its software products "Overjet Dental Assist," "Overjet Caries Assist," "Overjet Calculus Assist," "Overjet Periapical Radiolucency Assist," and "Overjet Charting Assistant." [Id.]. Since May 2021, Overjet has been using the "DENTAL ASSIST" trademark to market and sell its software. [Id. ¶ 22].

Overjet employs "color schemes, shapes, and designs" to help visualize detection and segmentation of diseases on dental X-rays. [Compl. ¶ 29]. In the fall of 2023, Overjet launched its "Anatomical Structures Visualization Tool" ("Visualization Tool") for Overjet Caries Assist, which introduced the coloring scheme and design at issue in the instant motion. [Id.]. The tool annotates X-rays, using white to represent enamel, purple to denote the pulp of a tooth, bright green lines with circles at the ends to indicate measurements of bone levels, and red translucency to mark areas of decay. [Id. ¶ 30; Inam Decl. ¶ 24]. Overjet chose these colors and shapes in order to create a "contrast with the gray scale" of the X-rays and with the ultimate goal of assisting with "patient assessment, diagnosis, and treatment planning." [Compl. ¶¶ 33, 34]. It

_____

deposits on bitewing and periapical radiographs, for patients eighteen years of age or older. [Compl. ¶ 18].

On September 21, 2023: the FDA approved Overjet's Periapical Radiolucency ("PARL") Assist software, "a radiological, automated, concurrent read computer-assisted detection software," to detect "periapical radiolucencies on permanent teeth captured on periapical radiographs." [Compl. ¶ 19].

On February 23, 2024: the FDA cleared "Overjet Charting Assist." [Compl. ¶ 18].

3

also selected the design and colors to help with brand identification; the purple, for example, complements Overjet's purple brand color.  [Id. ¶ 35].  Below is an example of an annotated X-ray created by Overjet's software using the segmentation approach.  [Id. ¶¶ 35, 45].



Videa is also a dental AI company, [Compl. ¶ 55]; see also [ECF No. 22-1 ("Hillen Decl.") ¶ 1], and it is Overjet's direct competitor, [Compl. ¶ 55; Inam Decl. ¶ 5; Hillen Decl. ¶ 24].  Founded in 2018, [Compl. ¶ 55; Hillen Decl. ¶ 2], Videa's AI software program, VideaAI, "analyze[s] radiographs and assist[s] clinicians in detecting and diagnosing oral diseases," [Hillen Decl. ¶¶ 4, 6].

Videa holds FDA clearance for various indications.  See [Compl. ¶¶ 66–69].  In December 2023, the FDA cleared "Videa Dental AI," previously known as "Videa Dental Assist,"[3] [Hillen Decl. ¶¶ 14, 26], for identifying and localizing a range of dental findings and indications, including caries or cavities and periapical radiolucency,[4] when analyzing bitewing,

_____

[3] Videa used the term "Dental Assist" from January to mid-March 2024.  [ECF No. 20 ("Opp'n") at 10].

[4] In addition to dental indications, the FDA clearance also encompasses the identification and localization of historical treatments, such as a bridge, crown, or filling, and the detection of "normal anatomy."  [ECF No. 11-7 ("Videa 510(k) Premarket Notification") at 4].

periapical, and panoramic X-rays taken from patients three years of age and older.  [Videa 510(k) Premarket Notification at 4].  If the software detects any indications, it "returns a set of bounding boxes representing the suspect dental finding."  [Id. at 7].  Unlike Overjet, VideaAI offers two views, or displays, of its software's findings: one for clinicians (the "Clinical View") and one for patients (the "Patient View").  [Hillen Decl. ¶ 9].  The Clinical View is "primarily used to assist clinicians in detection and diagnosis" and "uses boxes and lines with dots to quickly display these points of interest."  [Id.].  It is intended to be "an assistive tool."  [Id.].  The Patient View provides a more accessible display "for added patient education and comprehension," and is designed to be a "communication tool for [] provider[s]."  [Id.].  As such, unlike the Clinical View, it offers "a version of the results that are 'segmented' and highlights the shape of the points of interest" by "show[ing] more than mere lines and boxes." [Id.].  See infra examples of the Clinical and Patient View.  [Id.; Compl. ¶ 88].  It is the Patient View that is at issue in the present case.  See infra.



| Clinical View | Patient View |
|---|---|

As noted above, the two companies are direct competitors in the dental AI space.  See supra.  As such, in the fall of 2023, both companies were considered for a lucrative partnership

with the country's largest DSO, Heartland Dental ("Heartland").  [Compl. ¶ 88].  On December

5, 2023, Heartland announced that it had selected Videa as its dental AI partner.  [Id. ¶ 90].[5]

### B.    Procedural History

On February 23, 2024, Overjet initiated this action, [ECF No. 1], and filed the instant

motion for a preliminary injunction, [ECF No. 8].  Videa opposed the motion on March 19,

2024, [Opp'n], and Overjet then filed a reply in support of its preliminary injunction motion on

April 2, 2024, [ECF No. 29 ("Reply")].  On April 9, 2024, Videa filed its sur-reply.  [ECF No.

34 ("Sur-Reply")].  The Court heard oral argument on April 11, 2024.  [ECF No. 40].

## II.    DISCUSSION

### A.    Legal Standard

Preliminary injunctions function to "preserve the relative positions of the parties until a

trial on the merits can be held."  Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).  As a

result, "findings of fact and conclusions of law made by a court granting a preliminary injunction

are not binding at trial on the merits."  Id. (citing Indus. Bank of Wash. v. Tobriner, 405 F.2d

1321, 1324 (D.C. Cir. 1968)).  The granting of a preliminary injunction is "an 'extraordinary and

drastic remedy' . . . that 'is never awarded as of right.'"  Voice of the Arab World, Inc. v. MDTV

Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674,

689–90 (2008)).

When deciding whether to grant a motion for preliminary injunction, courts must

consider four factors:

> (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what
> extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the

---

[5] Independent of this contract, Overjet currently works with over 150 Heartland Dental offices.
[Compl. ¶ 88].

balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest.

Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).  As the moving party, Overjet bears the burden of satisfying each of these four elements.  See Nieves–Márquez v. P.R., 353 F.3d 108, 120 (1st Cir. 2003).

The First Circuit has held that these four factors "are not entitled to equal weight in the decisional calculus." Corp. Techs., 731 F.3d at 9.  Rather, the movant's likelihood of success on the merits "is the main bearing wall of the four-factor framework." Id. at 10.  "[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)).  Therefore, "[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm Wireless Servs., 287 F.3d at 9).

**B.    Likelihood of Success on the Merits**

**1.    Copyright Infringement**

To establish copyright infringement, a plaintiff must show: (1) ownership of a valid copyright in a work; and (2) a copying of constituent elements of the work that are original. Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver, Colo., 685 F. Supp. 2d 217, 225 (D. Mass. 2010), aff'd sub nom. Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29 (1st Cir. 2012).  "A plaintiff bears the burden of proving that the work, as a whole, is original and that it has 'complied with the applicable statutory formalities.'" Id. (quoting Lotus Dev. Corp. v. Borland, Int'l., Inc., 49 F.3d 807, 813 (1st Cir. 1995), aff'd, 516 U.S. 233 (1996)).  A certificate of copyright registration is "*prima facie* evidence of

copyrightability, and shifts the burden to the defendant" to establish the invalidity of the copyright.  Id.

Overjet avers that it owns a valid copyright for its source code.  [ECF No. 9 at 15]; see generally [ECF Nos. 11-23, 11-24 (collectively, "Source Code")].  Further, in selecting the "shades and shapes to label and organize results generated by its [] software," [ECF No. 9 at 15], the company made "artistic choices about the shapes and forms those colors would embody," [id.], and thereby created "expressive organizational choices . . . protected by copyright law," [Reply at 5].

Overjet alleges that Videa's Patient View copies its protected coloring scheme, shades, and shape.  [ECF No. 9 at 9–11, 15; Reply at 6]; see also [ECF No. 11-38]; compare [ECF No. 11-32 ("Overjet Approach") with [ECF No. 11-10 ("Videa Approach")].  Overjet first became aware of Videa's alleged infringement at the Heartland Dental Conference on December 9, 2023, when Videa presented the Patient View at its trade booth and Florian Hillen, the company's CEO, gave a presentation displaying images that purportedly copied Overjet's Visualization Tool.  [Compl. ¶ 94; ECF No. 9 at 11; Reply at 6].[6]  Overjet appears to suggest that Videa obtained the Visualization Tool when Overjet released it to all Heartland Clinics on November 15, 2023.[7]  See [Reply at 6].

---

[6] Overjet further argues that Videa falsely advertises that VideaAI has segmentation capabilities, when, in fact, it has only obtained FDA-clearance for the bounded box approach.  See infra.

[7] Overjet claims that it began developing its segmentation visualization display in July 2023, finalized its color and highlighting scheme by mid-August 2023, and started distributing its Visualization Tool to clients for feedback a few weeks later, on September 11, 2023.  [Reply at 6].

Videa counters that there has been no infringement.  [Opp'n at 17].  First, although Videa does not dispute the validity of Overjet's Source Code copyright, it argues that Overjet's color scheme, shades, and shapes created by its software are not entitled to copyright protection because they merely serve a functional purpose.  [Id. at 18–20; Sur-Reply at 4, 9–10].  Second, Videa claims that it adopted certain colors and shapes before Overjet did.  [Opp'n at 17–18].  As early as April 2022, Videa began using color-coded lines to denote the level of radiographic bone loss ("RBL") in its Clinical View.  [Id. at 9].  Specifically, it used green to indicate healthy gum levels, yellow to mark that there is some risk, orange to denote an even greater risk, and red to highlight a "potential problem."  [Id.; Hillen Decl. ¶ 11].  "This 'stoplight' system . . . was adopted because [the company] believed it is intuitive for patients and clinicians."  [Hillen Decl. ¶ 11].  At around the same time, Videa also started using red boxes to indicate tooth decay, [Opp'n at 9], an "obvious color choice to indicate warning . . . and commonly used across industries," [Hillen Decl. ¶ 12].  Moreover, at least as early as April 10, 2023, Videa "began developing its segmentation feature for Patient View."  [Opp'n at 9].  The Patient View segmentation continued using the same color-coding as for RBL in its Clinical View and also incorporated "shades of red" to highlight decay, large measurements of gum recession, and periapical radiolucency; white to depict enamel; and blue for pulp.  [Id.].  Third, Videa claims that the decision to use white to indicate enamel and blue to demarcate pulp was made "without knowledge of Overjet's scheme."  [Id. at 18].  Videa chose them "because white is the color of enamel and blue provides contrast to render pulp more visible."  [Id.; see generally [ECF No. 22-2 ("Clemens Decl.")].  According to Videa, these coloring decisions were made as early as October 12, 2023, for the Clinical View, [Opp'n at 10], and launched in the Patient View by

November 7, 2023, [id. at 18], which would have been before Overjet's November 15 release, [id.].

The Court first addresses whether Overjet can show ownership of a valid copyright in the colors, shades, and shapes used to organize results generated by the software code, which turns on whether those things are copyrightable. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 348 (1991) ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected."); see also 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").

Computer programs, such as the one at issue here, see [ECF No. 9 at 15], are "afforded copyright protection as literary works." e-Steps, LLC v. Ams. Leading Fin., LLC, No. 19-cv-01637, 2019 WL 9834429, at *2 (D.P.R. Sept. 25, 2019) (quoting Lotus, 49 F.3d at 813). As such, they may be subject to literal, referring to a program's source code, or, as here, non-literal copying, see [ECF No. 9 at 16; Opp'n at 19], which encompasses a "program's sequence, structure, organization, and user interface." McEnroe v. Mantissa Corp., No. 14-cv-12320, 2016 WL 7799636, at *9 n.6 (D. Mass. Feb. 29, 2016). In order to assess non-literal infringement claims, courts in this Circuit apply the three-step "abstraction-filtration-comparison" test. See id. at *9; see also Lotus, 49 F.3d at 815; Torah Soft Ltd. v. Drosnin, 136 F. Supp. 2d 276, 284 (S.D.N.Y. 2001) (the three-step analysis of abstraction-filtration-comparison first abstracts the program, then filters out unprotectable elements, and, third, compares the remaining protectable elements to the alleged infringer's work to assess whether substantial similarity exists) (citing Comput. Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 706 (2d Cir. 1992)).

10

i.  <u>Abstraction</u>

The abstraction step requires the Court to "dissect the allegedly copied program's structure and isolate each level of abstraction contained within it."  <u>Altai</u>, 982 F.2d at 707. Because Overjet has already identified the alleged protectable "materials," namely the shapes, colors, and shading used in the annotation of X-rays, [ECF No. 9 at 16–17; Opp'n at 19], "this Court need not engage in the abstraction process," <u>Real View, LLC v. 20-20 Techs., Inc.</u>, 683 F. Supp. 2d 147, 154 (D. Mass. 2010).

ii.  <u>Filtration</u>

The filtration analysis, step 2, requires courts to determine whether the materials identified in step 1 are copyrightable, by "filtering" the material identified in step 1 through "constitutional and statutory requirements of originality, the Copyright Act's distinction between expression and ideas or processes, the doctrines of 'merger' and 'scènes à faire,' and the public domain exception."  <u>Torah</u>, 136 F. Supp. 2d at 284 (at this stage, "the court filters out those elements that are not protectable.").

a.  <u>Functionality</u>

Pursuant to § 102(b),[8] the Court must distinguish between the annotated X-rays "expressive aspects," which can be copyrightable, and the functional aspects, which are uncopyrightable.  <u>See</u> <u>e-Steps</u>, 2019 WL 9834429, at *2 (citing <u>Oracle Am., Inc. v. Google Inc.</u>, 750 F.3d 1339, 1357 (Fed. Cir. 2014) ("anything that performs a function is necessarily uncopyrightable")).  Based on the record before the Court at this stage, it is not satisfied that

---

[8] "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).

Overjet's use of colors and shapes is merely expressive.  The underlying impetus of the color scheme and display is seemingly to aid clinicians in carrying out dental diagnostics.  See [Inam Decl. ¶ 25].  Thus, although there may not be industry-standards or guidelines specifying what colors and shapes may be used on an X-ray, it nevertheless appears intuitive to use certain specific colors to indicate problem areas or create contrast in order to efficiently identify pathologies, suggesting that Overjet's color, shape, and shading decisions were primarily driven by functionality.  See, e.g., [Compl. ¶ 34 ("Overjet touts the Anatomical Structures Visualization Tool to customers and potential customers as a tremendous aid in patient education when it comes to explaining dental anatomy, disease detection, and disease progression on radiographs, as well as the proximity to vital structures such as the pulp.  Highlighting enamel and pulp allows for a richer understanding of the nature and severity of disease progression and a visual that matches dentists' quantified AI finding.")].

### b.   Originality

With respect to originality, in order to be copyrightable, "[a] work must possess more than a *de minimis* quantum of creativity."  Torah, 136 F. Supp. 2d at 285 (citing Feist, 499 U.S. at 362).  Overjet seemingly concedes that the individual colors and shades do not individually meet a minimum level of creativity, [Mot. Hr'g Tr. 13:7–14:11, 54:4–5]; see also [ECF No. 9 at 16], but contends that the "overall design choices involved with what colors to use, what transparency and translucency to use, how to shade it, how to do the borders, [and] how to make it look as a whole [] is [what makes it] protectable."  [Mot. Hr'g Tr. 54:5–9].

Courts have found that in certain instances the creativity involved in the "selection, coordination, and arrangement" of elements that are by themselves not protectable may nonetheless meet the originality requirement.  Wilson v. Brennan, 666 F. Supp. 2d 1242, 1257

(D.N.M. 2009), aff'd, 390 F. App'x 780 (10th Cir. 2010); see also Feist, 499 U.S. at 358 ("[T]he principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection."). Here, however, the Court does not find that Overjet's decisions concerning the use and arrangement of particular colors, shades, and shapes is likely to be found sufficiently creative to merit copyright protection.

The case Overjet relies on, namely Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 68–69 (1st Cir. 2009), see [Mot. Hr'g Tr. at 14], involved more complex selections and arrangements. As noted by the court in that case, "any attempt to create a stuffed-animal rendering of the [real-life frog] will involve countless artistic decisions . . . concerning the precise size, shape, posture, color juxtaposition of features, stitching, and adornment of the toy." Coquico, 562 F.3d at 69. Here, the Court does not find the same array of "countless artistic decisions" among individually unprotectable elements. Overjet's decision-making focused on how to indicate caries, pulp, enamel, and bone level measurements on radiographic imaging, meaning it organized and arranged only four colors (red, white, purple, and green) and two shapes (a line with circles at the end). See [Compl. ¶ 30]. This relatively modest combination of unprotectable elements, even taken together, are unlikely to be original enough to warrant copyrightability. See Satava v. Lowry, 323 F.3d 805, 811 (9th Cir. 2003) (holding "that a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship."); see also United States v. Hamilton, 583 F.2d 448, 451 (9th Cir. 1978) (ruling that "trivial elements of compilation and arrangement [] are not copyrightable since they fall below the threshold of originality.").

13

Similarly, in Wilson, the court considered whether, among other things, a plaintiff who had relied on pre-existing government maps and other public domain documents created "sufficiently original" maps based on how he "selected, coordinated, and arranged the expressive features of the map to depict its factual [non-copyrightable] content."  666 F. Supp. 2d at 1254–55.  In finding that the plaintiff met the originality requirement, the court emphasized the numerous artistic decisions involved in generating the maps, including choosing the level of detail to depict, "what geographic features and roads to emphasize, what thickness of lines to use to delineate roads, how to indicate political boundaries, and many other details."  Id. at 1257.  The Court again notes the limited and fairly common elements at issue here and cannot conclude that the same level of artistic decision-making informed Overjet's choices.  See also Silverstein v. Penguin Putnam, 522 F. Supp. 2d 579, 599 ("A compilation may lack the requisite creativity where . . .  the author made obvious, garden-variety, or routine selections."); Real View, 683 F. Supp. 2d at 157, 158 (noting the "numerous creative and expressive choices" when determining that a screen display was copyrightable).  Because Overjet's choice of colors, shades, and shapes

is not sufficiently original, [9] it is unlikely to prevail on its copyright infringement claim based

upon the evidence before the Court at this stage.[10]

### 2. False Advertising Under the Lanham Act

In order to prove a claim for false advertising under the Lanham Act, a plaintiff must

show that:

---

[9] Videa also argues that the Copyright Office's Compendium ("Compendium") provides that "the enhancement of an x-ray is not something that would be protectable." [Mot. Hr'g Tr. 38:4–6]; see also U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 313.4(K) (3d. ed. 2021). Overjet counters that an X-ray, according to the Compendium may be copyrightable if "used as a tool for an author's creative expression . . . [and] if the resulting image contains a sufficient amount of artistic expression," [Mot. Hr'g Tr. 15:1–5]. Specifically, Overjet points to § 909.3(B), which provides that "types of technologies [such as X-rays] [that] were created for diagnostic or other functional purposes, [] can conceivably be used in an artistic manner." Compendium § 909.3(B) ("an application for an x-ray of a farm animal that has been modified with bright red colors and original images of processed food products[] . . . may [be] register[ed] [], because [of] the creative expression in the work as a whole."). At this juncture, the Court is not convinced that the annotations at issue here are comparable to the Compendium's description of artistic expressions. Regardless, the Court need not determine this issue as it has found that the arrangement of shapes and colors does not satisfy the originality requirement. See supra.

[10] Separately, the Court notes that, based on the current record, it cannot determine whether actual copying occurred. Videa contends that it had started using color-coded lines and other color schemes as early as April 2022 in its Clinical View, [Opp'n. at 9; Hillen Decl. ¶ 11], that it started developing its segmentation view for the Patient View in April 2023, [Clemens Decl. ¶ 6], and that by November 7, 2023, it had adopted the color scheme currently at issue, which would have been before Overjet's November 15 release. See supra; see also TMTV, Corp. v. Mass Prods., Inc., 345 F. Supp. 2d 196, 209 (D.P.R. 2004), aff'd, 645 F.3d 464 (1st Cir. 2011) (once ownership of a valid copyright has been established, courts then need to establish whether illicit copying occurred and, in so doing, "must initially determine that the defendant copied the protected work."); see also Rohm & Haas Elec. Materials, LLC v. Elec. Cirs. Supplies, Inc., 759 F. Supp. 2d 110, 125 n.107 (D. Mass. 2010) (when "courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve."); Spencer Co. v. Armonk Indus., Inc., 489 F.2d 704, 707 (1st Cir. 1973) (affirming the refusal to issue a preliminary injunction as an appropriate exercise of discretion in light of a "major factual dispute" between the parties that called into question whether [the plaintiff] would ever prevail on the merits").

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

Hilsinger Co. v. Kleen Concepts, LLC, No. 14-cv-14714, 2017 WL 3841468, at *8 (D. Mass. Sept. 1, 2017) (quoting Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310–11 (1st Cir. 2002)); see also 15 U.S.C. § 1125(a).  "A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or implicitly false—that is, the advertisement is true or ambiguous yet misleading."  Cashmere, 284 F.3d at 311.  "In assessing a Lanham Act claim for . . . false advertising, a determination first must be made as to what the statement by the defendant that grounds the claim communicates."  Azurity Pharms., Inc. v. Edge Pharma, LLC, 45 F.4th 479, 486 (1st Cir. 2022) (citing Clorox Co. P. R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 34 (1st Cir. 2000)).  Then, "[a] determination must be made about whether that statement, given what it communicates, is either false and/or misleading."  Id. (citing Clorox, 228 F.3d at 34).  This Circuit has recognized that a "literally false" statement may either be explicit or "convey[ed] by necessary implication," meaning that a claim is considered false when, "considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated."  Clorox, 228 F.3d at 34–35.  "Where the advertisement is literally false, a violation may be established without evidence of consumer deception."  Cashmere, 284 F.3d at 311.  Where the advertisement is implicitly false, "an additional burden is placed upon the plaintiff to show that the advertisement . . . conveys a misleading message to the viewing public."  Id. (quoting Clorox, 228 F.3d at 33).  In the context of preliminary injunctions, "a showing that the defendant's activities are likely to

cause confusion or to deceive customers is sufficient to warrant [] relief."  Id.; see also Quabaug
Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 160 (1st Cir. 1977) (holding that "a showing that
the defendant's activities are likely to cause confusion or to deceive customers suffices to
warrant relief, at least in cases where injunctive relief is requested.").

i.   False or Misleading Statements

Overjet avers that several statements in Videa's promotional materials, including a
LinkedIn post, videos, and blog posts, improperly state that (1) "Videa's software is safe and
effective for various medical purposes," even though it had not obtained the relevant FDA
clearance, or (2) that it had "reached a technological milestone in AI development before
Overjet, when exactly the reverse was true."  [ECF No. 9 at 19–20].  Videa counters that none of
the statements are literally false or misleading, and, if anything, amount to "quintessential
puffery."  [Opp'n at 22–23].  The Court reviews each of the alleged misrepresentations.

Statement # 1:  In a LinkedIn post from December 2023, which has since been deleted,
[Hillen Decl. ¶ 29], Videa stated, "[h]ear from the clinicians who are experiencing firsthand
VideaAI's transformative power."  [ECF No. 11-19].  Overjet alleges that the X-ray
accompanying the statement implied that Videa had FDA clearance for segmentation when, in
reality, the FDA had only cleared Videa's "bounding box" approach.  See [ECF No. 9 at 7].

Because Videa is in fact an AI platform, the statement is not explicitly false.  The Court
cannot, however, without the benefit of the full LinkedIn post, assess the extent to which Videa's
statement, in light of the accompanying X-ray, is misleading, and refrains from evaluating
Statement # 1 under the first prong of the Lanham Act at this juncture.

Statement # 2:  In a blog post dated April 5, 2021, Videa represented that its AI software
can "aid in the diagnosis and prediction of the progression of diseases such as caries or

periodontitis." [ECF No. 11-27 ("Ex. 27") at 2]. Overjet alleges that the statement "[i]ncorrectly suggests that the software is safe and effective for addressing disease findings or progression," when Videa has not been cleared for progression analysis. [ECF No. 9 at 19]. Videa maintains that it has not "claimed that it offers an AI tool that analyses progression." [Hillen Decl. ¶ 21]. Rather, it "merely provides this comparative tool to aid clinicians' analyses." [Id. ("Videa Health has a suite of features that make VideaAI an essential tool to enhance clinical practice. This suite includes a feature to help clinicians identify and visualize the progression of diseases. . . . VideaHealth's tools merely presents a convenient viewing option of already-cleared features.")].

The statement at issue emphasizes the benefits of "AI within diagnostics and treatment planning," [Ex. 27 at 2], and is neither false nor misleading. Videa's software localizes and identifies various dental indications in X-rays using bounding boxes. [Videa 510(k) Premarket Notification at 7]. In comparing these AI-generated annotated X-rays over time, clinicians can assess the extent to which certain conditions, including caries and periodontitis, have progressed. [Opp'n ¶ 21]. Videa thus provides "diagnostic assistance for clinicians enabled by AI," which is consistent with the statement at issue. [Ex. 27 at 2]. Accordingly, the Court does not find that the statement communicates that Videa provides progression analyses or that Videa has obtained FDA clearance for conducting such analyses.

Statement # 3: In the same August 5, 2021 blog post, Videa also stated that its "artificial intelligence software . . . helps gauge the caries level in carious lesions." [Ex. 27 at 3]. Overjet claims that the image above the statement "suggests that Videa's software is cleared to gauge the caries level in carious lesions," even though it was not cleared by the FDA to do so. [ECF No. 30 ("Second Inam Decl.") ¶ 12]; see also [ECF No. 9 at 19]. Videa counters that Overjet has

identified no literal falsity and that the statement includes no express or implied representation that its software was FDA approved at the time.  [Opp'n at 23].

The Court cannot conclude that Statement # 3 is literally or implicitly false.  As with Statement # 2, the focus of the statement is on how Videa's software can *assist* dentists; it does not provide that the software itself "gauge[s]" the caries level in carious lesions.  [Ex. 27 at 3 (emphasis added)].  Rather, the images generated by Videa's software help clinicians assess the caries level in carious lesions.[11]

Statement # 4:  In a blog post dated January 29, 2024, Videa wrote that "[w]e suggest choosing an AI provider with the most FDA-cleared annotations."  [ECF No. 11-11 ("Ex. 11") at 3].  Overjet asserts that since Videa has not been cleared for segmentation, the representation is inaccurate.  [ECF No. 9 at 19].  Videa counters that the representation neither refers to segmentation nor to Videa's offerings.  [Opp'n at 23].  According to Videa, annotations are "not equivalent to segmentation," but rather refer to "a visual way of showing the results of AI analysis, which can take many forms, including a simple bounding box."  [Hillen Decl. ¶ 32]; see also [Opp'n at 23].

The statement at issue seeks to persuade potential customers to partner with Videa, emphasizing the newly obtained FDA clearance as one of the reasons for choosing the company. The statement is not false on its face, as, at the time the blog post was published, Videa had just obtained FDA clearance for thirty plus indications.  [Hillen Decl. ¶ 14].  Further, in considering

---

[11] To the extent that Overjet alleges that the image right above the statement implies or misleadingly states that Videa has obtained the relevant FDA clearance for identifying and localizing caries level in lesions, the Court notes that when the blog was first published nearly three years ago, it contained a disclaimer noting that the product was "investigational" only. [Hillen Decl. ¶ 30].  After Videa obtained the relevant FDA clearance, it removed the disclaimer. [Id.].

the blog post in its entirety, the Court does not find that the images and statement combined "convey[] by necessary implication," Clorox, 228 F.3d at 34–35, that "annotation," that is labeling an X-ray, refers to FDA clearance for segmentation.  Such a claim is too attenuated, especially as Videa does annotate its X-rays using bounding boxes.  United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1181 (8th Cir. 1998) ("Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false.").

To the extent that Overjet claims that the statement is misleading because the image right above the alleged misrepresentation is captioned "VideaAI's patient view showing a segmented x-ray," [Ex. 11 at 3], which could create an implied connection between "annotations" and "segmentations," the Court notes that Overjet has made no showing that the statement is "likely to mislead and confuse consumers" into believing a "false . . . representation of fact."  Clorox, 228 F.3d at 33; see also Bridal Expo, Inc. v. van Florestein, No. 08-cv-03777, 2009 WL 255862, at *7 (S.D. Tex. Feb. 3, 2009) (noting that "[i]f applying for injunctive relief, the movant must prove that the ads have 'a tendency to deceive consumers,'" which requires a showing that "at least some consumers were confused." (quoting Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 497–98 (5th Cir. 2000))).

Statement # 5:  In a blog post dated January 4, 2024, Videa stated that it is the "only dental AI company to spend time and money to retest and improve [caries] models."  [ECF No. 11-28 ("Ex. 28") at 3].  Overjet avers that this statement is literally false because after the FDA cleared Caries Assist in May 2022, [Compl. ¶ 16], Overjet submitted a new iteration of its model that "expand[ed] the age range and image type and improved model accuracy for caries," [id. ¶ 17], for clearance, which the FDA approved on March 27, 2023, [id.].

20

Although Videa disputes that the second iteration of Overjet's caries model constituted an "improvement," [Opp'n at 23], the renewed submission of Caries Assist indicates that Overjet "spen[t] time and money" to develop its product.  This means that Videa was not the "only" company to devote resources to enhancing its caries model, rendering the statement literally false.[12]

Statement # 6:  Overjet alleges that in the same January 4, 2024 blog post, Videa also inaccurately provided that VideaAI, Videa's AI software program, could "identify cysts," even though it lacked the applicable FDA clearance.  [ECF No. 9 at 20; Ex. 28 at 2].  Videa responds that the statement does not include any "overt or implicit representation of FDA clearance for identification of cysts alone," and that when looking at the cited sentence in full, it is clear that Videa was referring to FDA clearance for periapical radiolucency ("PRL") detection, which includes cysts.  [Opp'n at 23]; see also [Clemens Decl. ¶ 10].  Overjet does not deny that PRL encompasses cysts, see [Second Inam Decl. ¶ 22], but asserts that "[i]dentification of a PRL is not the same as identification of a cyst," [id.]

Based on the current record, which lacks any expert explanation of what PRL entails, the Court is unable to evaluate whether Videa's statement is literally false.  Nonetheless, the Court observes that the FDA 501(k) Premarket Notification, which, according to Videa, "clearly states

---

[12] The Court acknowledges that Videa has since removed this representation from the blog post, [Opp'n at 23], and will consider this accordingly in its discussion of irreparable harm.  See Spruce Env't Techs., Inc. v. Festa Radon Techs., Co., No. 15-cv-11521, 2016 WL 1611433, at *4 (D. Mass. Apr. 21, 2016) (citing Camel Hair & Cashmere Inst. Of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 13 (1st Cir. 1986) ("The issue of the non-moving party's good faith in curing the violation is more relevant to the discussion of irreparable harm than to the moving party's likelihood of success on the merits.")).

all of the clearances associated with [the blog post], including PRL for potential cysts," [Hillen Decl. ¶ 31], does not mention "cysts" or "identify[ing] cysts," see generally [Videa 510(k) Premarket Notification].  As such, despite being true or ambiguous the statement may be misleading.

Statement # 7:  Overjet asserts that Videa also falsely advertised that "[p]roviders can use VideaAI to help diagnose all patients, regardless of age."  [ECF No. 9 at 20].  As with Statement #5, Videa has since modified the sentence at issue and the blog post now provides that "[p]roviders can use VideaAI to help diagnose all patients 3 years and older."  [Sur-Reply at 11].

Nevertheless, at the time the statement was issued, the statement was literally false. Videa's software had only been cleared to treat patients aged three and older.  See generally [ECF No. 11-7].

Statement # 8:  In a video published on January 4, 2024, Videa claimed that Videa Dental Assist (now Videa Dental AI) is "[t]he world's first pediatric dental AI."  [ECF No. 11-29]. Overjet objects that it obtained clearance to use Overjet Caries Assist for pediatric patients (patients at least twelve years of age) in March 2023, before Videa did in January 2024, see [ECF No. 11-36 at 6], and for Overjet Periapical Radiolucency Assist in September 2023, [ECF No. 11-37 at 5].  Videa has since updated the video and removed the statement at issue, [Sur-Reply at 11], but maintains that its statement was accurate because it was the first to receive FDA clearance for patients aged three and older, [Opp'n at 23].

Videa's statement is literally false.  Pediatric care refers to the treatment of infants, children, adolescents, and young adults, and commonly encompasses all ages up to twenty-one

years old.[13]  Overjet's March 2023 FDA clearance pertains to patients who are twelve years or older, which includes pediatric patients.  See [ECF No. 11-36 at 6].

Statement # 9 and # 10:  In its reply, Overjet alleged additional misrepresentations,[14] including pertaining to a segmentation view with the caption "[i]ntroducing the first FDA-cleared dental AI for patients aged 3 and up," in a February 15, 2024 blog post, [ECF No. 31-6 ("Ex. 44")], and YouTube video dated February 20, 2024, [ECF No. 31-7 ("Ex. 45")], which, the company states, falsely implies that Videa AI is FDA-cleared for segmentation, [Reply at 8]. Videa has since replaced the relevant images.  [Sur-Reply at 11].

Although the original blog post and video do not refer to FDA clearance for segmentation, see generally [Exs. 44, 45], the Court finds that the images overlayed with the caption could lead a viewer to recognize the claim (that Videa obtained FDA clearance for segmentation) as "readily as if it had been explicitly stated."  Clorox, 228 F.3d at 35; see also United Indus. Corp., 140 F.3d at 1180–81 (noting that in some circumstances "even a visual image, or a visual image combined with an audio component, may be literally false) (citing Coca–Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 318 (2d Cir.1982) (finding "that the squeezing-pouring sequence in [defendant's orange juice] commercial [was] false on its face [because] [t]he visual component of the ad ma[de] an explicit representation that [the juice] [was] produced by squeezing oranges and pouring the freshly-squeezed juice directly into the carton . . . [even though] the [juice was] heated and sometimes frozen prior to packaging.")).

---

[13] See Cleveland Clinic, "Pediatrician," https://my.clevelandclinic.org/health/articles/21716-what-is-a-pediatrician (last visited July 2, 2024).

[14] See also Statements # 11 and 12, infra.

Statement # 11:  Overjet also challenges a statement on Videa's website that its software "annotates 18+ months of historical images to help monitor and track progression of disease." [Second Inam Decl. ¶ 16; ECF No. 31-10 ("Ex. 48")].  Next to the statement, there are two X-rays taken one year apart, with the second radiograph providing a percentage amount by which the disease has progressed.  [Second Inam Decl. ¶ 16].  According to Overjet, this incorrectly suggests that VideaAI "tracks and quantifies the progression of the disease."  [Id.].  Videa counters that the statements accurately reflect that VideaAI "can aid dentists with monitoring and tracking diseases," and that there is no "representation that the tool itself preforms a progression analysis."  [Sur-Reply at 12].

As discussed above, see supra, Videa's software seeks to assist clinicians in diagnosing pathologies by allowing side-by-side comparisons of annotated X-rays that have identified and localized indications.  See [Hillen Decl. ¶ 21].  Determining the extent to which a disease has progressed is left to the dentist.  [Id.].  Because Videa's AI, which annotates X-rays, "*help*[s] monitor and track progression of disease," [Ex. 48 at 2 (emphasis added)], the statement is literally true.  Nonetheless, the statement may be misleading.

The X-ray captioned "Current Visit" indicates that the tooth's caries size has increased by 20% since the previous X-ray was taken.  [Id.].  That image, coupled with the statement that Videa's "AI annotates 18+ months of historical images to . . . track progression of disease," [id.], may suggest that the software—rather than the clinician—evaluates the progression.  Thus, the statement is, at worst, true but misleading.

Statement # 12:  Overjet further contends that "Videa continually advertises this segmentation feature without any disclaimers regarding FDA approval, including at the Yankee Dental trade shows where Overjet was also present."  [Reply at 8 (quoting Second Inam Decl. ¶

53)].  Specifically, Overjet objects to a banner with the caption "Do More With More," which displayed an annotated X-ray in Patient View, for which Videa has not obtained FDA clearance. [Reply at 8; ECF No. 31-8 ("Ex. 46")].

This claim is too attenuated.  At issue here is a banner containing a stand-alone image of an X-ray without any references to FDA approvals or even any other language describing the image.  [Ex. 46].  The banner contains no falsity—whether explicit or implicit.

In sum, there are six statements, Statements # 5 and 7–11, that are likely to survive the first prong for false advertising under the Lanham Act.

        ii.  Materiality

Plaintiffs are "not required to present evidence that defendants' misrepresentation actually influenced consumers' purchasing decisions, but that it was likely to influence them." Cashmere, 284 F.3d at 313 (emphasis omitted) (citing Clorox, 228 F.3d at 33 n.6).  "One method of establishing materiality involves showing that the false or misleading statement relates to an 'inherent quality or characteristic' of the product."  Id. at 311–12 (citing Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir.1997)).

Overjet offers scant reasoning in support of the materiality requirement, see generally [ECF No. 9], but its main argument is seemingly that, given that segmentation is an innovative and competitive technology, Videa's purported false advertising of its segmentation capabilities means that potential customers are likely to choose Videa over Overjet, [ECF No. 9 at 18–21, 23–25].  Videa responds that Overjet has provided no evidence that any of its allegedly false advertising has had "any material effect on purchasing decisions."  [Opp'n at 24].

The Court is not persuaded that Statements # 5 and #11, which primarily focus on the idea that Videa's AI software can aid in the diagnosis and prediction of various diseases, pertain

to the "inherent quality or characteristic" of Videa's product, which is software aimed at the detection of numerous indications in patients aged three years or older.  See [Videa 510(k) Premarket Notification at 4, 7].  It is not obvious that the alleged misrepresentations are necessary for Videa's product to qualify as innovative software or to be competitive in the dental AI space.  Cf. Cashmere, 284 F.3d at 312 (finding that the misrepresentation relating to the cashmere content of cashmere-blend blazers was an inherent characteristic of the product because "cashmere is a basic ingredient of cashmere-blend garment," and, without it, the "product could not be deemed cashmere-blend garment or complete in the cashmere-blend market.").  In contrast, Statements # 7 and #10, which specifically refer to VideaAI's pediatric qualities, more naturally relate to the inherent quality of Videa's software, that is its ability to identify and localize specific dental findings in patients as young as three years old.  See [ECF No. 11-7].

That said, Videa sells its products to sophisticated customers such as dental practices and DSOs.  See [Compl. ¶¶ 9, 22, 88; Opp'n at 16].  Unlike layperson purchasers, who are seemingly not at issue here, these customers likely have the scientific and technological understanding to fully appreciate Videa's product offering and its limitations.  See Pegasystems, Inc. v. Appian Corp., 463 F. Supp. 3d 152, 161 (D. Mass. 2020) (considering the sophistication of consumers when assessing the materiality element); Bridal Expo, 2009 WL 255862, at *8 ("It is difficult for the Court to conclude that sophisticated audiences such as vendors [in the wedding market], who have familiarity with the [] wedding market, would be misled by" quotations from purported attendees of a bridal exposition that has not yet taken place).

Online advertising and presentations during trade shows appear to be a starting point for potential purchases, but do not alone drive such decisions.  It is reasonable to assume that, given

the actors involved and the considerable monetary value of potential contracts, the sales process is thorough and lengthy, with a heavy focus on the software's actual capabilities, including relevant FDA clearance.  The Court is therefore not persuaded that, at this stage, Overjet will prevail on the materiality element and need not continue its analysis under the Lanham Act. Encompass Ins. Co. of MA v. Giampa, 522 F. Supp. 2d 300, 311 (D. Mass. 2007) ("[F]ailure to allege factual support for any of the[] elements is fatal to a claim for false advertising under the Lanham Act.").  Nevertheless, for completeness, the Court finds that Overjet is also unlikely to make a sufficient showing in relation to deception and injury.

### iii.  Deception

When considering injunctive relief, consumer deception is presumed for literal falsity claims.  See Cashmere, 284 F.3d at 314.  For the statements that are literally false, namely Statements # 5, 7–10, Overjet would not need to "demonstrate actual consumer deception."[15] Balance Dynamics Corp. v. Schmitt Indus., Inc., 204 F.3d 683, 693 (6th Cir. 2000).  For Statement #11, which the Court has deemed impliedly false, Overjet would only need to show that it is "likely to cause confusion or to deceive customers."  Cashmere, 284 F.3d at 311. Overjet is unlikely to meet that burden.[16]

The crux of Overjet's argument is that Videa "advertises software for use as a safe and effective medical device," when it in fact lacks "the advertised indicia of safety and

---

[15] The Court notes that Videa has since cured all but two statements (#5 and #11).  This weighs against a finding of irreparable harm.  See infra.

[16] Separately, Overjet "would still be able to avail [itself] of a presumption of consumer deception" on the alternative ground that Videa "intentionally set out to deceive or mislead costumers."  Cashmere, 284 F.3d at 316.  Because Overjet did not allege facts establishing that Videa acted deliberately to deceive customers, the company is not entitled to this presumption.

effectiveness, and that it is even possible that Videa has not developed or included segmentation capabilities in its software." [ECF No. 9 at 20]. Overjet, does not, however, articulate how the misrepresentations tend to cause consumer deception. As noted supra, both Videa and Overjet operate in a space with sophisticated customers. It seems reasonable that discussions surrounding relevant FDA clearance—and verification thereof—are a critical component of the sales process. A few promotional videos and blog posts, it appears, are unlikely to cause consumer deception among the relevant pool of potential consumers.

### iv. Interstate Commerce

There is no dispute that by posting the alleged misrepresentations online, including on Videa's website, LinkedIn, and YouTube, Videa placed them into interstate commerce. See McGrath & Co., LLC v. PCM Consulting, Inc., No. 11-cv-10930, 2012 WL 503629, at *6 (D. Mass. Feb 15, 2012) ("Courts have generally held that when one operates a website containing alleged false or misleading statements, the party causes those statements to enter interstate commerce through the internet.").

### v. Injury

The final element in the Lanham Act analysis requires Overjet to show that it has been or is likely to be injured because of the alleged misrepresentations. In the context of injunctive relief, a "showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient." Cashmere, 284 F.3d at 311 (by contrast, "a plaintiff seeking damages must show actual harm to its business."). Specifically, when the advertisements are literally false, "only a slight likelihood of injury need be shown to warrant injunctive relief." Camel Hair, 799 F.2d at 15.

In light of the discussion above, the Court finds that Overjet is unlikely to meet its burden on this element.  In relation to Overjet's allegations of reputational harm, it "has presented nothing beyond mere conjecture with regard to the anticipated harm to [its] reputation." Riverdale Mills Corp. v. Cavatorta N. Am., Inc., 146 F. Supp. 3d 356, 362 (D. Mass. 2015).  It has also not established that it suffered a loss of customers due to Videa's actions, including that Heartland's decision to partner with Videa, [Compl. ¶ 90], was influenced by the alleged misrepresentations, see generally [ECF No. 9; Reply].  Accordingly, the Court does not find that there is a likelihood of injury.

### 3. Unfair Competition

Overjet further contends that Videa's purported false and misleading advertisements violate state law, specifically Mass. Gen. L. ch. 266, § 91 and ch. 93A, § 11.[17]  [ECF No. 9 at 21–22].  These claims "rise[] or fall[] with the federal claim."  Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 63 F. Supp. 3d 149, 157 (D. Mass. 2014), rev'd in part on other grounds, 794 F.3d 168 (1st Cir. 2015) (quoting Am. Med. Sys., Inc. v. Biolitec, Inc., 774 F. Supp. 2d 375, 393 (D. Mass. 2011)) (regarding ch. 266, § 91); Milk St. Cafe, Inc. v. CPK Media, LLC, No. 16-cv-11416, 2017 WL 3425170, at *12 (D. Mass. Aug. 9, 2017) (regarding ch. 93A, § 11).  Because the Court concludes that Overjet is unlikely to prevail on its federal claim, the company's state claims are likely to fail, too.

---

[17] Because the Court has determined that Overjet is unlikely to prevail on the false advertising claim under the Lanham Act, it need not consider the argument that Videa unfairly competes against Overjet by copying the company's "playbook."  [ECF No. 9 at 22].

### C.      Irreparable Harm

"[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Arborjet, 794 F.3d at 173 (quoting New Comm Wireless Servs., 287 F.3d at 9).  The Court nonetheless notes, however, that Overjet also would likely have been unable to make a sufficient showing of irreparable harm.

"Plaintiffs seeking injunctive relief must make a 'clear showing' that substantial and immediate irreparable harm is 'likely' in the absence of an injunction." Oxford Immunotec Ltd. v. Qiagen, Inc., 271 F. Supp. 3d 358, 367 (D. Mass. 2017) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  "[E]conomic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction." Suero v. Fed. Home Loan Mortg. Corp., No. 13-cv-13014, 2013 WL 6709001, at *7 (D. Mass. Dec. 17, 2013) (quoting Hull Mun. Lighting Plant v. Mass. Mun. Wholesale Elec. Co., 506 N.E.2d 140, 142 (Mass. 1987)).  If, however, "the loss threatens the very existence of the movant's business," economic losses may be sufficient.  Id.

Overjet's claims that it is likely to lose customers and future business and its first mover-advantage, as well as suffer harm to its reputation and brand, are overly speculative.  The company has not substantiated these claims or provided any indication that it lost the Heartland contract because of Videa's alleged wrongful actions.  See Spruce Env't Techs., Inc., 2015 WL 4038802, at *5 (concluding that because plaintiff alleged that at least one customer had been affected by defendant's false advertisement it had "demonstrated a modicum of irreparable harm to its goodwill and reputation.").

Further, in relation to the false advertising claim, all of the misrepresentations the Court has deemed literally false, Statements # 5, 7–10, have been cured.  See supra.  This weighs

significantly against a finding of irreparable harm, as it not only reduces the likelihood of injury to Overjet's reputation, but also the loss of future business.  See Riverdale Mills Corp., 146 F. Supp. 3d at 363.

**III.      CONCLUSION**

Accordingly, Overjet's motion for a preliminary injunction, [ECF No. 8], is DENIED. Overjet has failed to make a sufficient showing that it is likely to succeed on the merits.  At this time, Overjet has failed to demonstrate that the color, shape, and shades used in its Visualization Tool are copyrightable, that Videa has made materially false and misleading statements when advertising its products, or that it is likely to suffer irreparable harm.

**SO ORDERED.**

July 19, 2024                                          */s/ Allison D. Burroughs*
                                                      ALLISON D. BURROUGHS
                                                      U.S. DISTRICT JUDGE